[Sac. No. 3141. In Bank.—May 20, 1921.]

W. R. ELLIS, Petitioner, v. W. D. STEPHENS et al., Constituting the Department of Engineering of the State of California, etc., Respondents.

[1] HIGHWAYS —FEDERAL AID TO STATE IN CONSTRUCTION OF.—The United States statute on the subject (39 Stats. at Large, 355) makes it clear that the fund derived from the United States government under said act to aid the state in the construction of "rural post roads" represents the amounts paid by the federal government as its share of the cost of construction, which amounts may be paid either upon completion of the work or, if so arranged, during the progress of the work.

[2] ID.—CONTROL OF FUNDS.—So far as the United States government is concerned, the payment of the funds for state highway con-

struction to the proper state officer terminates its interest in the fund. In no instance is the fund payable by the United States government until the work for which it is apportioned has been actually performed, and as the money thus paid by the United States government belongs to the state, it is subject to the control of the latter acting through its appropriate officials, the duty of the state and its officers and the United States government being fully performed when the highway approved by the Secretary of Agriculture has been constructed by the state in accordance with the contract, and it is no concern of the federal government what is done by the state with the funds turned over to it, the control of such funds so paid being one entirely for the determination of the state legislature, or, if thereto authorized by constitution or statute, by such other officers of the state as are given control of the funds.

[3] ID.—WHAT FUND MONEY PAYABLE TO.—It is apparent from the state legislation on the subject that when the legislature authorized the advisory board to designate the fund or funds into which payments from the federal government should be made, it was intended that such payments should be made into funds under the control of the advisory board.

[4] ID.—EXPENDITURE OF FUNDS.—It is clear from the scope and purpose of the act creating the advisory board and the state engineering department and from the duties and powers of such department that the purpose and intent of the legislature was to authorize the expenditure of federal aid by the state engineering department for such purposes in connection with public highways as it was authorized to expend the funds of the state, and to that end to designate to the state treasurer and controller some appropriate fund under its control in the state treasury to which to credit payments received from the federal government.

[5] ID.—DEFICIENCY IN SALE OF STATE HIGHWAY BONDS—USE OF FEDERAL AID FUND TO PAY UNAUTHORIZED.—An examination of the constitution and statutes on the subject makes it clear that the use of the federal funds contributed for state aid in construction of state highways to pay a deficiency caused by the inability to sell state highway bonds at par as required by the constitution is expressly prohibited.

[6] ID.—"SURPLUS MONEY."—"Surplus money" under the State Highway Act of 1915 (Stats. 1915, pp. 650, 652, sec. 4) is money agreed upon by the state treasurer and the members of the state board of control as not necessary for immediate use, and such amount so designated can be used for the purchase of bonds as therein authorized.

[7] ID.—PURCHASE AND SALE OF BONDS.—It is clear that the people in adopting the constitutional amendment and the legislature in

CLXXXV Cal.—46

authorizing the purchase and sale of bonds by the state board of control did not intend that these bonds should be sold at a discount either by the treasurer or by the state board of control.

[8] ID.—FEDERAL AID MONEY TRANSFER TO GENERAL STATE FUND UNAUTHORIZED.—The department of engineering of the state has no authority to direct the payment of money appropriated by the federal government for state aid in the construction of state highway into the surplus general fund for the purpose of paying the difference between the par and selling value of bonds, whether in the form of commission or otherwise, and the legislation authorizing the board to designate the fund into which this money should be paid contemplated that it should be paid into funds which under the statute organizing said board are under the control of that board for the creation, maintenance, and repair of state highways.

APPLICATION for Writ of Mandate to require the Department of Engineering of the State of California to designate to which of the state highway funds certain moneys appropriated by the federal government should be apportioned. Writ granted.

The facts are stated in the opinion of the court.

Dunn & Brand for Petitioner.

U. S. Webb, Attorney-General, R. T. McKisick, Deputy Attorney-General, James L. Atteridge and C. C. Carleton for Respondents.

Wm. H. Devlin, *Amicus Curiae.*

WILBUR, J.—Petitioner prays for a writ of *mandamus* directing the members of the department of engineering of the state of California to make a proper order indicating to the state treasurer the highway fund to which to credit the proceeds of certain checks on the treasurer of the United States aggregating $329,011.82, now in his possession. These checks were issued in payment of the obligation of the United States to the state of California under a contract entered into between the State Highway Commission and the Secretary of Agriculture of the United States, whereby the United States agreed to pay a portion of the costs of the construction of certain state highways therein designated under plans thereby approved and adopted. This contract

for government aid to the state in building these highways was authorized by act of Congress, approved July 11, 1916 (39 Stats. at Large, 355), whereby certain moneys were appropriated for the purpose of aiding the various states in the construction of such highways as were approved by the Secretary of Agriculture. A writ of mandate was denied by the district court of appeal of the third district, and upon petition for transfer to this court, the matter was transferred to this court for hearing. It appears from the answer of the defendants that they have ordered the proceeds of said checks to be credited to the "surplus of the general fund" of the state to make up a contemplated deficiency due to a loss expected to be suffered by the purchase and sale of three million dollars par value of the "Third State Highway Bonds" of 1919, being a portion of the forty million dollar bond issue authorized by the amendment to the constitution in that year. (Const., art. XVI, sec. 2, [Stats. 1919, p. 1518].) It is proposed by the state board of control, acting in concert with defendants, to purchase the three million dollars of the third state highway bonds at par and to sell them at the market discount of 6.4138 per cent, thereby suffering a loss of $192,414.

The petitioner contends that this procedure is in violation of law and that it is the duty of the state officer to deposit this fund in the proper highway fund. It is alleged by the defendants that the proposed procedure was adopted by the state board of control acting in concert with the defendants because of the fact that state bonds bearing four and one-half per cent interest per annum could not be sold for more than 93.5862 per cent of such par value, and that it is the purpose of the defendants and state board of control to cover this loss by the application of the funds coming from the United States government to that difference.

[1] The United States statute in question makes it clear that the fund derived from the United States government under the above-mentioned act to aid the state in the construction of "rural post roads" represents the amounts paid by the federal government as its share of the cost of construction. These amounts may be paid either upon completion of the work or if so arranged, during the progress of the work. The federal statute directs (section 6) that after the approval of the plans for the highway, "The Secretary

of the Treasury shall thereupon set aside the share of the
United States payable under this act on account of such
project, which shall not exceed fifty per centum of the total
estimated cost thereof. No payment of any money appor-
tioned under this act shall be made on any project until
such statement of the project, and the plans, specifications,
and estimates therefor, shall have been submitted to and ap-
proved by the Secretary of Agriculture. . . . The Secretary
of Agriculture and the State highway department of each
State may jointly determine at what times, and in what
amounts, payments, as work progresses, shall be made under
this act. Such payments shall be made by the Secretary
of the Treasury, on warrants drawn by the Secretary of
Agriculture, to such official, or officials, or depository, as may
be designated by the State highway department and author-
ized under the laws of the State to receive public funds of
the State or county." The United States statute authorizes
the treasurer of the United States to pay not exceeding fifty
per cent of the cost of work by paying that amount to the
state instead of paying it directly to the contractor or others
doing the work.

As the voters of the state have provided for certain funds
in connection with the financing of the acquisition and con-
struction of highways known as the "Third State Highway
Fund," "Third State Highway Interest and Sinking Fund,"
"Third State Highway Revolving Fund," and "Third State
Highway Sinking Fund" (Const., art. XVI, sec. 2), and as
the money was advanced by the state to pay the one-half
of the cost of the highways agreed to be paid by the United
States government, it would seem that the logical destina-
tion of the aid from the United States would be in the fund
depleted by such payment.

In this particular instance a contract having been entered
into between the authorized officers of the state and of the
United States by which it was agreed in advance that the
United States should pay certain amounts to the state in
connection with the improvement of certain highways to be
constructed by the state of California, the substance of such
an arrangement is that the state of California pays for only
such portion of the highway as is not covered by the appro-
priation from the federal government, that is to say, its one-
half of the cost. The amount paid to the state is a reim-

bursement of the state and of the particular funds used by the state in the progress of the work.

[2] So far as the United States government is concerned, the payment of the funds to the proper state officer terminates its interest in the fund. In no instance is the fund payable by the United States government until the work for which it is apportioned has been actually performed. As the money thus paid by the United States government belongs to the state of California, it is subject to the control of the state acting through its appropriate officials. The duty of the state and its officers to the United States government has been fully performed when the highway approved by the Secretary of Agriculture had been constructed by the state in accordance with the contract. It is no concern of the government of the United States what is done by the state with the funds turned over to it. The control of such funds so paid is one entirely for the determination of the state legislature, or, if thereto authorized by constitution or statute, by such other officers of the state as are given control of the funds.

We will turn now to a consideration of the law of the state bearing upon the question. Section 13 of the act relating to the construction of state highways (Stats. 1917, p. 694) provides that all co-operative engineering work now existing or to be engaged in by the state with the United States government shall be placed under the department of engineering; that the advisory board shall have full power to determine the kind, quality, and extent of such work under co-operation with said government before entering into agreement with said government for such work. It further provides: ''All unexpended moneys provided for by law on the aforesaid co-operative basis shall be expressly placed under the full control of the department of engineering and the State Controller shall transfer such funds to the credit of the said department. . . . All moneys received by the State Treasurer from the United States government under project agreements relating to Federal aid road work shall be credited by the State Controller to such fund or funds as the state department of engineering shall designate.''

The question here involved is whether the advisory board of the state engineering department must cause funds received from the United States government to be deposited in

some road fund under their control or whether they can cause them to be deposited in the surplus of the general fund of the state for the purpose of reimbursing those funds for loss caused by the sale of the state highway bonds by the board of control on the market at a discount.

While the authority of the advisory board as above stated is in terms broad enough to authorize them to deposit the money in question in any fund in the state treasury designated by them, that general authority must be read in the light of their powers and the purpose of the legislation. By section 9 of the act (Stats. 1917, p. 692) the department of engineering is given full possession and control of all roads and highways which have been declared and adopted as "state roads" and "state highways" and all "state roads" and "state highways" which may hereafter be acquired and constructed. It is provided that "All expenditures by the State for highway purposes, except as otherwise hereafter provided by law, shall be under the full charge of the department of engineering, *and all moneys appropriated for such purpose shall be made payable upon the proper demand of said department* when approved and audited by the State Board of Control." (Italics ours.) It is also provided that "Said California Highway Commission shall have the supervision and direction of all state roads and state highways now existing and the improvement, maintenance, repair and protection thereof, and have charge of and perform all other duties relating to state roads and state highways which may be imposed upon said commission by said advisory board."

[3] It is apparent from this legislation that when the legislature authorized the advisory board to designate the fund or funds into which payments from the federal government should be made it was intended that such payments should be made into funds under the control of the advisory board. It could not have been the intention, for instance, to delegate to the engineering advisory board the power to place these moneys in funds created to build state prisons, reform schools, insane asylums, or in the fund for the purchase of land for some then existing or contemplated state institution, or in the fund for state aid to orphans, half-orphans, and abandoned children. [4] It is clear from the scope and purpose of the act creating the advisory board and the state engineering department and from the duties and powers of

such department that the purpose and intent of the legislature was to authorize the expenditure of this federal aid by the state engineering department for such purposes in connection with public highways as it was authorized to expend the funds of the state and to that end to designate to the state treasurer and controller some appropriate fund under its control in the state treasury. Respondent board contends that, this being true, their appropriation of the money for the purpose of paying a deficiency in funds caused by the inability to sell state highway bonds at par as required by the constitution is a proper exercise of the powers vested in them.

It is manifest that if such an appropriation of public money violates an express provision of the law, it is not authorized by implication arising from the power of the board to designate the fund in which the money must be carried on the books of the treasurer and controller.

[5] An examination of the constitution and statutes on the subject makes it clear that such a use of public moneys is expressly prohibited by law. The constitutional amendment approved July 1, 1919 (Const., art. XVI, sec. 2; Stats. 1919, p. 1518), authorizing issuance of the forty million dollar bond issue provides that the State Highway Act of 1915 (Stats. 1915, pp. 650, 652, sec. 4) relative to the advertising and sale of bonds shall control in the disposition of the bonds thereby authorized. This statute provides that the state treasurer shall sell the bonds to the highest bidder for cash at public sale and shall not accept any bid which is less than the par value of the bonds plus accrued interest. It is for this reason that the state board of control proposes to purchase the bonds at par. Their authority to purchase bonds is found in section 679 of the Political Code, which authorizes the board of control to purchase state bonds when they have "surplus money" at their disposal for that purpose, and directs that the treasurer shall make appropriate transfers of funds upon his books in the event of such purchase from the surplus fund to the bond fund. [6] "Surplus money" under this statute is money agreed upon by the state treasurer and the members of the state board of control as not necessary for immediate use; such amount so designated can be used for the purchase of bonds as therein authorized. (*Stephens* v. *Richardson* (*Board of Control*), 184

Cal. 721, [195 Pac. 651],) It is also provided in the same act (Stats. 1913, p. 564), section 3: "Any bonds purchased or held under the provisions of this act, may be sold or exchanged for other bonds of any of the classes described in section 1 of this act, and the money received from any such sale may be reinvested by the State Board of Control in the purchase of any such bonds; provided, that no such sale or exchange shall be made *at a price which will result in a net loss to the state;* and provided, further, that any interest or premium collected or received by the state from any bonds purchased or held under the provisions of this act shall be credited by the state treasurer to a fund to be known as the 'Bond Investment Fund' which fund is hereby established. The state treasurer shall semi-annually, on the last days of June and December, transfer one-half of the amount then in said fund to the general fund, and shall transfer one-half of the amount then in said fund to the state school land fund." (Italics ours.)

This legislation, like the constitutional amendment and most legislation regulating the sale of state and municipal bonds, is predicated upon the theory that there will be purchasers found for the bonds at not less than par. Nor is any provision made in the law for a sale of bonds purchased by the state board of control which cannot be sold except at a loss. On the contrary, this constitutional amendment expressly prohibits a sale of bonds for less than par, and the statute authorizing the purchase of the bonds of the state by the state board of control expressly prohibits a sale thereof at a net loss. Thus it would be the duty of the state board of control to hold all bonds purchased by it until authorized by the legislature to dispose of them at a loss, if such loss is a necessary incident of a sale. So far as the purchase of state bonds by the state board of control is concerned, the transaction is essentially a bookkeeping one by which surplus funds of the state, that is, funds not immediately necessary for the purpose to which they are appropriated, may be transferred to the fund which the bonds were intended to create, thus making such funds immediately available pending the actual sale of the bonds to private parties. When so sold, the money derived therefrom would replenish the surplus fund of the general fund and be distributed therefrom when needed to the appropriate fund

from which the money was originally diverted. As the state treasurer is prohibited from selling the highway bonds at less than par, it is clear that the state board of control in purchasing such bonds must bid par and accrued interest. That board is in turn prohibited from selling said bonds "at a price which will result in a net loss to the state." (Stats. 1913, p. 564, *supra.*) The state board of control proposed to buy bonds at par and in pursuance of an understanding theretofore had with a syndicate of bond buyers to resell to them at 93.5862 per cent. It is clear that this will result in a loss to the state of the difference between the par value of the bonds and the percentage paid by the syndicate, and it is immaterial whether that loss takes the form of an allowance to the bond buyers as commissions or what the form of such loss may be, the fact will still remain that the state by such purchase and sale has suffered a loss to the extent that the par value of the bonds is depreciated. The phrase "net loss to the state" relates to the difference between the purchase price of bonds paid by the state board of control and the net returns from the sale of such bonds by them. If the net returns of the sale are less than the purchase price of the bonds there is a net loss, and this is prohibited. The purpose of the legislature in prohibiting a sale of bonds at a "net loss" was to prevent a loss in the several funds established by law and temporarily transferred to the surplus fund of the general fund.

If the statute authorizing the state board of control to purchase and resell state highway bonds issued under the constitutional amendment of 1919 should be construed according to defendants' contention, so that a sale could be made by such board of control at a discount below par, the statute so construed would be clearly unconstitutional as violating the provisions of article XVI, section 2, authorizing and requiring the sale of said bonds for not less than par. The fact that the legislature has authorized the state board of control to purchase the bonds at par and sell at a discount, if we so construe the law, would not justify the sale of these bonds in violation of the constitutional requirement that they be sold at or above par. The plain intent of the constitutional requirement is that the state shall receive the par value of the bonds, and any legislation which would justify a purchase and sale by officers of the state as a means of ulti-

mately disposing of the bonds at less than par would be clearly unconstitutional. If, therefore, the legislative provision authorizing the state board of control to purchase and sell bonds is construed as contended for by the defendants, the law would be unconstitutional so far as applied to the third state highway bond issue. But we do not so construe the statute. [7] It is clear that the people in adopting the constitutional amendment and the legislature in authorizing the purchase and sale of bonds by the state board of control did not intend that these bonds should be sold at a discount either by the treasurer or by the state board of control. It is no doubt true, as suggested by the attorney-general, that no one anticipated the situation that subsequently arose because of the war, whereby state and municipal bonds bearing four and one-half per cent interest were salable on the market only when offered for less than par. On the other hand, the very purpose of the constitutional requirement that the bonds should not be sold for less than par was to anticipate such a situation by prohibiting such a sale at all, for if there was no danger of the bonds being sold for less than par, there was no reason for making the requirement that they must be sold at par.

The defendants' answer is framed upon the theory that there will be no net loss to the state by reason of the sale of the bonds as contemplated, because if the bonds are not sold, highway work must be suspended and great loss will result therefrom to the state. The loss prevented by securing funds for the continuance of the work is not to be added to the selling price of the bonds to ascertain whether there has been a net loss to the state. The gain to be derived by the state from the use of the money is not an element that enters into the question of whether there has been a net loss. In determining that loss only two items are to be considered—the cost of the purchase of the state bonds by the state board of control and the net returns from the sale thereof. If the latter are not equal to or greater than the former the sale is not authorized. Let it be observed that we are considering only the case of state bonds, so bought and sold.

[8] It is clear from the foregoing that the defendants have no authority to direct the payment of this money into the surplus of the general fund for the purpose of paying the

difference between the par and selling value of the bonds, whether in the form of commission or otherwise. It is also clear that the legislation authorizing the respondent board to designate the fund into which this money should be paid contemplated that it should be paid into funds which under the statute organizing said board are under the control of that board for the creation, maintenance, and repair of state highways.

It is ordered that a peremptory writ of mandate be issued directing the defendants to designate to the treasurer and controller the fund into which this money shall be paid, which fund shall be one already existing by law for the construction, maintenance, or repair of state highways or one created or designated by the respondent board for that purpose.

Olney, J., Shaw, J., Angellotti, C. J., Lennon, J., Lawlor, J., and Sloane, J., concurred.